**Arthur J. HUMPHREYS**

v.

**UNITED STATES.**

**C.D. 3736; Protest 65/13483–25472.**

United States Customs Court
Second Division.
March 13, 1969.

---

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, Hadley S. King, and James S. O'Kelly, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Sheila N. Ziff and Owen J. Rader, New York City, trial attorneys), for defendant.

Before RAO and FORD, Judges.

FORD, Judge:

The subject merchandise, invoiced as high carbon cut track spikes, was classified under the provision "Other" as provided for in item 646.30 of the Tariff Schedules of the United States, at 1.2 cents a pound. Plaintiff claims the articles are classifiable under TSUS item 646.28 as "cut" spikes over 2 inches in length, at 0.2 cent a pound.

The relevant tariff provisions, set forth under subpart D of part 3, schedule 6, are as follows:

Brads, nails, spikes, staples, and tacks, all the foregoing, not described in the foregoing provisions of this subpart, of base metal:
    Of iron or steel (except articles with heads of nonferrous metals):
        Of one piece construction:
            Made of round wire:

| Item | Description |
|------|-------------|
| 646.25 | Under 1 inch in length and under 0.065 inch in diameter ...... |
| 646.26 | 1 inch or more in length and 0.-065 inch or more in diameter . |
| | Cut: |
| 646.27 | Not over 2 inches in length .... |
| 646.28 | Over 2 inches in length ........0.2¢ per lb. |
| 646.30 | Other .....................1.2¢ per lb. |

There is no disagreement concerning the statutorily significant facts that the articles are spikes made of steel of one piece construction over 2 inches in length. Accordingly the only issue is whether the spikes are "cut" within the meaning of item number 646.28, as plaintiff claims.

Before reviewing the evidence submitted concerning the subject spikes, it would not be premature to determine the tariff meaning of the word "cut" as it is used in the classification arrangement of the relevant TSUS tariff description.

At page 187 of the Tariff Classification Study, 1960, the following information appears:

Items 646.25 through 646.36 would cover base metal brads, nails, spikes, staples, and tacks not covered by the foregoing provisions of this subpart. Items 646.25 through 646.32 set forth in clarified, systematic form proposed provisions derived from existing pro-

visions applicable to these products of iron or steel under paragraph 331. Items 646.25 and 646.26 covering such products made of round wire involve no rate changes. Item 646.27 is derived from the two provisions under which "cut tacks and cut brads" not over 2 inches long and "cut hobnails and cut nails" not over 2 inches long are dutiable at 7.5 percent and 10 percent ad valorem, respectively. The rate of 8 percent ad valorem is a weighted average of the current rates. *Item 646.28 is derived, without rate change, from the existing provision for "cut nails and cut spikes" over 2 inches long. Item 646.30 covering "other" iron and steel brads, nails, etc., of one piece construction is derived from the existing provisions* for "horseshoe nails, and other iron or steel nails, not specially provided for" dutiable at 1.25 cents per pound and *"spikes,* tacks, brads, and staples, *not specially provided for"* dutiable at 0.5 cents per pound. Predominant imports are at the rate of 1.25 cents per pound which is the rate reflected in items 646.30. * * * [Emphasis supplied.]

The quoted excerpt from the explanatory note clearly expresses the intention of the Tariff Commission concerning the transposition, from the Tariff Act of 1930 to TSUS, of the importations intended to be included within the competing tariff descriptions involved in this case.

Insofar as applicable here, item 646.30, under which the subject spikes were classified, was derived from the preexisting provision in paragraph 331 for "spikes, * * *, not specially provided for." Item 646.28, under which the spikes are claimed to be classifiable, was derived from the preexisting provision, also in paragraph 331, for "cut spikes."

Under the Tariff Act of 1930, an importation describable as a spike was subject to classification under one of three possible provisions: a cut spike; a spike made of iron or steel wire; or, a spike not specially provided for. In the rele-

vant TSUS tariff descriptions, the same tripartition of spikes is retained. An iron or steel spike of one piece construction is subject to classification as a spike made of round wire (items 646.25 and 646.26), a cut spike (items 646.27 and 646.28) or as an "other" spike (item 646.30).

If the Congress intended any change in the TSUS provision for spikes such intent is not manifested either in the TSUS provisions or in any relevant legislative information.

With respect to the TSUS description for "other" spikes, we consider it as comparable to the usual "not specially provided for" clauses contained in the Tariff Act of 1930. Accordingly, we conclude that the subject provision for other spikes was intended to cover any spikes, encompassed by the superior heading immediately preceding item 646.25, but not specifically described in either of the subordinate tariff descriptions for cut spikes or spikes made of round wire. See, Arthur J. Humphreys et al. v. United States, 59 Cust.Ct. 231, C.D. 3128, appeal pending.

Spikes have been provided for in the tariff statutes since the earliest days. The first session of the Federal Congress, in the Tariff Act of July 4, 1789, levied an import duty of one cent a pound on "nails and spikes." Although no tariff distinction was made between various types of nails or spikes, there was at that time a noted difference between hand-wrought and machine-made nails.

> Hand-wrought nails were a very early product in America. By 1790, machine-made nails were beginning to appear, coming first from England; but wrought nails were still being used long after 1800. [Dictionary of American History, 1942, Vol. 1, p. 249.]

The distinction between wrought and cut nails was first recognized, but without a tariff difference, in the Tariff Act of 1824, which contained a provision for "iron nails, cut or wrought." A provision for spikes, "cut or wrought," first appeared in the Tariff Act of 1842. The

Tariff Act of 1883, contained provisions for: "cut nails and spikes, of iron or steel"; "wrought iron or steel spikes"; and "wire-nails, and all other wrought-iron or steel nails." Virtually, the same tripartition of nails and spikes into cut, wrought, and wire varieties continued in the tariff acts of 1890, 1897 and 1909.

It would be of more than historical interest to determine the difference between cut and wrought nails or spikes as it was understood in the nineteenth century. At that time, there were three types of nails as determined by the method of manufacture—wrought, cut, or cast. The Century Dictionary, 1890, volume IV, page 3928; Knight's American Mechanical Dictionary, 1876, volume II, pages 1505–1506.

In the Dictionary of Architecture and Building, 1901, volume II, page 1006, the following descriptions were given:

*cut nail.* One cut by a machine, as distinguished from wrought and wire nails.

*wrought nail.* Anciently, a nail worked by hand, each piece having been forged separately.

The Century Dictionary, *supra,* in volume II, at page 1415, defined the word "cut" as meaning:

Manufactured by being cut by machinery from a rolled plate; not wrought or made by hand; as, *cut* nails.

Knight's American Mechanical Dictionary, *supra,* in volume I, at page 665, described a cut nail as:

A nail *cut* from a nail-plate, in contradistinction to one forged from a nail-rod, as a clasp, horse-shoe, or flat-headed nail.

The following definitions are taken from the Standard Dictionary of the English Language, 1894:

*cut* 5. Severed by machinery from a rolled plate of iron; not wrought by hand; as, *cut* nails.

*cut nail,* the common square-sided nail cut from a sheet of iron by powerful machinery, which also upsets and forms the head: so called to distinguish them from wrought nails.

In a discussion of nails, contained in the New American Cyclopedia, 1861, in volume XII, at page 87, the same distinction is recognized:

NAIL. * * * The principal division of nails is into wrought and cut, the former being made from tough wrought iron, the latter from rolled plates * * *. Very large nails are called spikes.

Excluding wire and cast nails from consideration, it is reasonable to conclude from the information contained in the quoted authorities that in nineteenth-century tariff nomenclature all other nails (including spikes) were classifiable either as wrought nails or cut nails. Wrought nails were nails wrought into form by forging or rolling. Cut nails were nails formed by cutting, usually, if not exclusively from a rolled plate. Accordingly, a nail not made from wire and not formed by forging or rolling would be one formed by a cutting operation. This cutting operation, according to the available authorities, expectedly—but not necessarily—would be performed on rolled plate.

Resuming the review of the predecessor provision of the TSUS classification for cut spikes, the Tariff Act of 1909 contained specific provisions for cut nails and cut spikes of iron or steel (paragraph 159) and spikes of wrought iron or steel (paragraph 162). This division of spikes into two classifications continued the tariff treatment found in the tariff acts of 1890, 1894, and 1897.

A change was introduced in paragraph 554 of the Tariff Act of 1913. Spikes, admitted free of duty were classifiable either as "cut spikes of iron or steel" or simply as "spikes." The specific description for "spikes of wrought iron or steel" was not continued, and wrought spikes were classified simply as spikes; eventually in the Tariff Act of 1922 they were classified as "spikes * * * not specially provided for."

The Tariff Information Surveys, 1921, affords some information as to the types of spikes intended to be included under the respective descriptions in paragraph 554 for "cut spikes of iron or steel" and for "spikes." In the discussion captioned "CUT NAILS AND CUT SPIKES" there are contained the following comments:

## DESCRIPTION

Cut nails and spikes are classed together under the tariff acts, and in the statistics in Commerce and Navigation. The distinction is merely one of size, the method of manufacture differing only slightly.

## DOMESTIC PRODUCTION

\*      \*      \*      \*      \*

*Process of manufacture.*—A machine to manufacture iron nails was invented in this country in 1786. The first steel nail was made in 1883, about the time that the wire nail was becoming important commercially.

Cut nails are manufactured from nail plates of iron or steel. These have been rolled to the required thickness, and then cut across their length in the widths slightly greater than the length of the nail to be made. These pieces are fed at a black heat to a machine which cuts them across the end into nail blanks. The cut is made at a slight angle, and the strip turned over each time, so that these blanks are slightly tapering. The hot blank is seized and headed immediately in the machine and the finished nail ejected. Another method of forming the taper, used in the case of the larger sizes, is to have the strip rolled with one edge thicker than the other. It can then be cut at right angles, and the turning of the strip done away with.

The following information is contained in the discussion captioned "FORGED SPIKES", classified as "spikes" under paragraph 554:

## DESCRIPTION

A forged spike is a large metal nail produced from a bar by a forging machine, or by forging on an anvil.

Railroad-track spikes from the bulk of the forged spikes manufactured in the United States. In 1914, 96.7 per cent of all the forged spikes manufactured in rolling mills were of this kind. Forged spikes are also made for use in the construction of docks and ships, and wherever heavy timbers have to be fastened and for some reason bolts or wire spikes are unusable. Such spikes are forged to the size and shape best fitted for the work.

The railroad-track spike has been largely standardized. It has a shank of square cross section, a chisel-shaped point, and a head in the shape of an irregular oval. The angle which the bearing surface of the head forms with the shank corresponds to that of the flange of the rail. The standard lengths are 5, 5½, and 6 inches, the cross section varying from nine-sixteenths to five-eighths inch.

\*      \*      \*      \*      \*

The forged spike comes under the tariff classification, "spikes." This also includes wire spikes. (See Survey on Wire Nails and Spikes.)

## DOMESTIC PRODUCTION

\*      \*      \*      \*      \*

*Process of manufacture.*—Railroad-track spikes may be made of either iron or steel. Charles E. Slyke, of the Inland Steel Co., states that they are made of basic open-hearth steel, of 0.15 to 0.24 per cent carbon, 0.45 to 0.50 per cent manganese, 0.05 per cent phosphorus, and 0.06 sulphur. This material comes in the form of square bars, cut in 23½-foot lengths, one sixty-fourth inch larger than the shank of the spike.

These bars are heated by being passed through a furnace. As they come from the furnace, a laborer with a pair of tongs passes them to a forging machine, which shears, points, and

heads them. They are then cooled and packed.

Forged spikes are easily made from bar iron or steel on the anvil and are often so made when only a few are required. The factory production is not specialized, but is carried on in mills making other iron and steel products, and is not a separate industry.

The tariff treatment of spikes, under paragraph 554 of the Tariff Act of 1913, was a subject also discussed in the Summary of Tariff Information, 1920. The following comments are taken from pages 726–727 of that Summary:

The different kinds of wire products are not advantageously grouped. With all of them on the free list, this fact has only statistical importance, but provision for duties for the various groups would render it more vital. Especially it may be pointed out that wire spikes are not, as cut spikes, grouped with nails of a similar method of manufacture, but fall in the general provision for "spikes," containing forged spikes, an entirely different product; that horseshoe nails, the product of a distinct industry, are grouped with hobnails and "all other" nails of wrought iron or steel, products manufactured largely by firms making cut tacks and brads; and that the word "springs," now obsolete in the industry, is retained. The following arrangement would avoid these difficulties:

(1) Cut nails and cut spikes of iron or steel.

(2) Horseshoe nails.

(3) Cut tacks and brads, hobnails, and all other wrought-iron or steel nails not specially provided for in this section.

(4) Wire nails and spikes of wrought iron or steel.

(5) Wire tacks, brads, or staples of wrought-iron or steel. (Four and five might be combined: (4–5) Wire nails, spikes, tacks, brads, and staples of wrought-iron or steel.)

(6) Spikes, not specially provided for in this section.

The arrangement suggested in the quoted summary was incorporated into the Tariff Act of 1922. Paragraph 331 contained provisions for:

(1) Cut nails and cut spikes, of iron or steel;

(2) Nails and spikes made of iron or steel wire; and

(3) Spikes, not specially provided for.

Virtually the same three subdivisions for the classification of spikes were continued in paragraph 331 of the Tariff Act of 1930. This tripartition continued until the enactment of TSUS. The tariff description "other" was, as stated above, substituted for the "not specially provided for" spikes.

Lexicographic authorities, more recent than those mentioned above, afford some basis for understanding the tariff description for cut spikes as used in the 1930 Act.

The dictionaries of general use defined "cut" as follows:

cut, p. a. 1. That has been subjected to the action of cutting. Specif.: a Formed, shaped, or fashioned by cutting; as, cut stone; cut nails. [Webster's New International Dictionary, 1930].

cut, p. a. 5. Severed by machinery from a rolled plate of iron; not wrought by hand; as, cut nails. [Funk & Wagnalls New Standard Dictionary, 1939.]

The technical dictionaries and other reference sources contain some information relevant to an understanding of the meaning of cut nails and cut spikes.

Nails are either wire nails of circular cross section and constant diameter or cut nails of rectangular cross section with taper from head to point. The larger sizes are called spikes. * * * [Marks Mechanical Engineer's Handbook (5th ed.), 1951, p. 1070.]

Nails. Based upon the process of manufacture there are three kinds of nails in common use, namely, plate or

cut nails, wire nails, and clinch-nails. [Kidder-Parker Architects' and Builders' Handbook (18th ed.), 1956, p. 1947.]

Kidder-Parker, *supra*, describes cut nails as follows:

Cut nails are made from a strip of rolled iron or steel of the same thickness as the finished nail and a little wider than its length, the fiber of the iron being parallel with the length of the nail. Special machinery cuts the nails out in alternate wedge-shape slices, the heads are then stamped on them and the finished nails dropped into the casks.

The Dictionary of Technical Terms, 1957, at page 109, describes cut nails as:

Machine-cut iron nails as distinguished from wire nails which are now in more general use.

Cut nails are described in Audels Mechanical Dictionary, 1942, as:

Carpenters' nails, cut by machine from a strip of iron instead of being forged separately, or made from wire, as wire nails.

Spikes are provided for in the Brussels Nomenclature at item 73.31, which is as follows:

Nails, tacks, staples, hook-nails, corrugated nails, spiked cramps, studs, spikes and drawing pins of iron or steel, whether or not with heads of other materials, but not including such articles with heads of copper.

The classification of spikes, nails, etc., in the Brussels Nomenclature is not, as in TSUS, subdivided, but rather these articles are simply grouped generically. However, in the explanatory notes to item 73.31 the following information is presented which bears upon the methods of producing these items:

The present heading covers:

(A) *Nails, tacks, staples and similar fastenings,* usually manufactured by the following methods:

(1) *Cold pressing* from wire of required thickness.

(2) *Forging* (by hand or machine) from an iron shank of the required thickness which is hammered to a point, after which the head is stamped out by a nail-making machine.

(3) *Cutting from sheet or strip* followed, if necessary, by finishing either mechanically or by hand.

(4) *Hot rolling* bars in nail mills which shape the head and shank simultaneously.

(5) *Die stamping* of the head from a small disc of metal, the previously prepared shank being fixed at the same time. This process is normally used for nails with rounded heads such as upholstery nails.

(6) *Casting.*

We have exhausted the reference sources available to us in an effort to arrive at a dispositive definition of the tariff description for cut spikes. Because of the inadequacies in and discrepancies among the various authorities referred to above, it is impossible to obtain a clear-cut understanding of the term "cut." However, three conclusions, sufficient to decide this case, may be noted. (1) The classification of a spike as a cut spike is to be determined by the method of manufacture, rather than by reference to any commercial or common meaning of the article; (2) the cutting operation used to form cut spikes is generally understood to refer to method of producing the entire body of the spike rather than any particular portion or part of it; (3) a spike manufactured by a forging process (hammering or rolling) is intended to be classified as an "other" spike under TSUS item 646.30.

With these conclusions in mind, we turn to an examination of the record in this case. As a consequence of the first conclusion mentioned above, we remove from consideration so much of the evi-

dence as was intended to establish a commercial designation for cut spikes.

The evidence concerning the method of manufacturing the subject spikes may be briefly summarized as being produced at a rate of 80 to 90 per minute by a machine referred to as a Barr spike machine. A bar of steel which is approximately 25 feet long and reasonably square in section, being ⅝ by ⁴³⁄₆₄ inch, is used. The bar is heated in a gas-fired furnace to a temperature of about 2,000 degrees, Fahrenheit. At that temperature, the bar is fed into cutting rolls, the rotation of which draws the bar from the furnace. The cutting rolls contain cutters which cut the point and subsequently sever the pointed blank from the bar stock.

The pointed blank then is transported to a die by means of feed rollers. The forward motion of the blank is restricted by a stop gauge in front of the die and a gripping die descends and holds the spike in the die cavity. At that point, a "header" advances and upsets the stock allowance into the cavity in the die, thereby forming the head of the spike.

After the head is formed, the header and gripper retract, and a knockout pin lifts the spike from the die. Two "pickers" eject the spike from the die cavity. The spike then drops onto a conveyor, and is subsequently transported to be packaged in containers for shipment.

One of plaintiff's witnesses who described the operation of the spike machine characterized the subject spike as having the head "forged" at the top end, and the wedge-shape point "cut" at the bottom end. There was no testimonial or other evidence concerning the method of production of the bar of steel which was fed into the furnace and then drawn into the spike machine.

To distinguish between the subject spike and spikes which are forged, rather than cut, plaintiff introduced into evidence a spike referred to as a bridge spike or ship spike. A witness for plaintiff testified that this other type of spike (sometimes referred to in the record as a forged spike) was produced at the rate of one to two minutes for each spike. The point on the forged spike was produced by a "repetitious blow" operation.

In describing the manufacture of the forged spike, the witness explained:

Well, there is a separate shearing operation from a bar stock, a forging operation which is separate for the head, and a separate operation for forging for the point, which is repeated blows to create the point.

When asked to describe the differences between the subject importation and the forged spike, the witness answered:

The point has been cut rather than forged.

If there is any other difference between the method of manufacturing a forged spike as compared with the method of manufacturing what plaintiff claims is a cut spike, such difference is not shown by the evidence.

Therefore, to sustain plaintiff's claim, we must hold that a cut spike is one apparently identical with a forged spike except for, and only for, the fact that the point of the spike is cut rather than forged. We are not persuaded that such a holding would be in accord with the statutory scheme for the classification of spikes.

As explained above, of all the definitions or descriptions of a cut nail or cut spike not one restricts the cutting operation to the point of the article; and every one suggests that the cutting process is used to form the entire body of the nail or spike. Also, we are presented with a spike which according to plaintiff's witness is proportionately as much forged as it is cut.

Accordingly, for these reasons, plaintiff's protest is overruled and judgment will be entered accordingly.